IN CLERK'S OFFICE
US DISTRICT COURT
*JUNE 9, 2026*
BROOKLYN OFFICE

FTB:RWN
F. #2025R00133

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

    - against -

BIANCA VIEUX,
    also known as "B,"
STEVEN BOYCE,
    also known as "Heavy Pockets,"
DAIJA-NEK JOHNSON,
DESTINY MENDEZ,
    ██████████████████

VALERIA WALDRON,
CHRISTOPHER WALKER, and
MICHELLE WILSON,

          Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - X

SUPERSEDING
INDICTMENT

Cr. No. 25-271 (S-1) (NCM)
(T. 18, U.S.C., §§ 982(a)(1),
982(a)(2)(A), 982(b)(1), 1028(f), 1344,
1349, 1957, 2 and 3551 et seq.; T. 21,
U.S.C., § 853(p))

THE GRAND JURY CHARGES:

## INTRODUCTION

At all times relevant to this Superseding Indictment, unless otherwise indicated:

I.    The Defendants and Relevant Individuals and Entities

1.    The defendant BIANCA VIEUX, also known as "B," was a resident of, at different times, Queens County, New York and Miami, Florida.

2.    The defendant STEVEN BOYCE, also known as "Heavy Pockets," was a resident of Kings County, New York. BOYCE was employed by the New York City Transit Authority since at least September 2022.

3. ██████████████████████████████████

████████████████████  █████████████████

██████████  ████████████████████████████

████████████████████

4.    The defendant CHRISTOPHER WALKER was a resident of Queens County, New York.   WALKER was employed by the New York City Department of Correction as a correction officer at the Rikers Island Correctional Complex ("Rikers Island") beginning in approximately June 2017.

5.    The defendant VALERIA WALDRON was a resident of, at different times, Queens County, New York; Maryland; and Texas.   WALDRON was employed by the New York City Department of Correction as a correction officer at Rikers Island from approximately June 2017 to February 2022.   On the date of this Superseding Indictment, WALDRON was employed by the Texas Department of Criminal Justice as a parole officer.

6.    The defendant DAIJA-NEK JOHNSON was a resident of Queens County, New York.

7.    The defendant DESTINY MENDEZ was a resident of Kings County, New York.

8.    The defendant MICHELLE WILSON was a resident of Fort Worth, Texas.

9.    Aaron Warren was a resident of Queens County, New York.   Warren was employed by the New York City Department of Correction as a correction officer at Rikers Island from approximately June 2017 to August 2023.

10.     Tara Dildy was a resident of Queens County, New York.   Dildy was employed by the New York City Department of Correction as a correction officer at Rikers Island from approximately January 2018 to January 2024.

11.     Individual #1, an individual whose identity is known to the Grand Jury, was a resident of Nassau County, New York.   Individual #1 made payments by check for various purposes.

12.     Bank #1, Bank #2, Bank #3, and Bank #4 (collectively, the "Banks"), entities the identities of which are known to the Grand Jury, were depository institutions, the deposits of which were insured by the Federal Deposit Insurance Corporation.

13.     Credit Union #1 and Credit Union #2 (collectively, the "Credit Unions"), entities the identities of which are known to the Grand Jury, were financial institutions, the accounts of which were insured by the National Credit Union Share Insurance Fund.

14.     Investment Company #1, Investment Company #2, and Investment Company #3 (collectively, the "Investment Companies"), entities the identities of which are known to the Grand Jury, were investment companies that offered brokerage accounts to individual customers.   Each of the Investment Companies offered a check-deposit feature that allowed customers to deposit checks into their brokerage accounts.

15.     Company #1, Company #2, Company #3, Company #4, and Company #5 (collectively, the "Companies"), entities the identities of which are known to the Grand Jury, were entities that made payments by check for various purposes.   Company #1 was a shipping company located in Union City, California.   Company #2 was a non-profit organization that provided services to people with disabilities in New York City.   Company #3 was a bank with branches in the Eastern District of New York and elsewhere.   Company #4 was an insurance-

claims business located in New York, New York.   Company #5 was a construction company located in Red Bay, Alabama.

II.     The Falsified-Checks Scheme

16.     Between approximately July 2023 and June 2025, the defendants BIANCA VIEUX, DAIJA-NEK JOHNSON, DESTINY MENDEZ, ███████████ VALERIA WALDRON, CHRISTOPHER WALKER, MICHELLE WILSON, and others engaged in a fraudulent scheme to deposit more than $3 million worth of falsified checks purportedly made out by the Companies, Individual #1, the City of New York and other entities into accounts controlled by the defendants at banks, credit unions and investment companies including the Banks, Credit Unions, and Investment Companies.   Where the falsified checks cleared and money was successfully deposited into these accounts, the defendants then withdrew or transferred the fraudulently obtained money from their accounts before the fraud was detected.

17.     As part of the Falsified-Checks Scheme, the defendant BIANCA VIEUX sought out individuals to open bank accounts into which falsified checks could be deposited.   As VIEUX described in text messages sent on approximately May 18, 2025: "You know [slang term for Bank #1] and [Bank #4] that's my playground[.]   100k and better[.]"   As VIEUX described in another text message sent on approximately June 20, 2025: "I never set up a man in my life ! lol I scam the government not human beings I don't steal from people I still [sic] from banks [. . . .]"   The defendants DAIJA-NEK JOHNSON, DESTINY MENDEZ, VALERIA WALDRON, CHRISTOPHER WALKER, and MICHELLE WILSON each opened bank accounts at Bank #1 and elsewhere, into which falsified checks were deposited.   Where the deposits were successful, the defendants then withdrew the fraudulently obtained money from these accounts.   As another

part of the Falsified-Checks Scheme, the defendant ██████████ created falsified checks for WALKER in exchange for a fee.

    A.    <u>July 18, 2023: Deposit of Falsified Check from Company #1</u>

18.    On approximately June 21, 2023, a check bearing check number 128187 in the amount of $119,012.50 was made out by Company #1 to a payee located in Brooklyn, New York. The true name and address of the payee on this check were subsequently falsified to be the name and address of the defendant CHRISTOPHER WALKER.

19.    On approximately July 5, 2023, the defendant BIANCA VIEUX sent the defendant CHRISTOPHER WALKER a text message with the name, address, account number, PIN number, and password for an account at Bank #1 with a number ending in 2163 (the "2163 Account"), which belonged to WALKER. On approximately July 18, 2023, the falsified check numbered 128187 was deposited into the 2163 Account.

20.    Thereafter, between approximately July 18, 2023 and August 7, 2023, the defendant CHRISTOPHER WALKER and others withdrew more than $116,000 in cash from the 2163 Account. On multiple occasions, cash withdrawals were made from automatic teller machines ("ATMs") in amounts of $3,000 and $1,000, for a total amount of $4,000 per ATM.

21.    On approximately August 12, 2023, the defendant BIANCA VIEUX messaged the defendant CHRISTOPHER WALKER: "When you ready to go again lmk ! Respectfully"; "One hand washes the other ! Only looking out for my peoples"; "And if you have other people lmk[.]" Then, on approximately August 14, 2023, VIEUX messaged WALKER: "Ok also to pull the 4k out every morning[,]" consistent with the repeated withdrawals of fraudulently obtained cash from the 2163 Account in amounts of $4,000 per ATM.

Case 1:25-cr-00271-NCM    Document 118    Filed 07/07/26    Page 6 of 22 PageID #: 491

6

**B.    December 2023: Deposit of Falsified Check from Company #2**

22.    On approximately August 1, 2023, Aaron Warren sent the defendant BIANCA VIEUX a text message, asking if she could help him in the same way that she helped the defendant CHRISTOPHER WALKER.   VIEUX responded, "Yea absolutely[.]"

23.    On approximately December 1, 2023, a check bearing check number 7416 in the amount of $93,270.38 was made out by Company #2 to a payee located in New York. The true name and address of this payee were subsequently falsified to be the name and address of Aaron Warren.   On approximately December 14, 2023, this falsified check was deposited into an account at Bank #1 with a number ending in 3928 (the "3928 Account"), which belonged to Warren.

24.    Following the fraudulent deposit, between approximately December 26, 2023 and December 29, 2023, Aaron Warren and others withdrew more than $90,000 in cash from the 3928 Account.   On multiple occasions, cash withdrawals were made from ATMs in amounts of $3,000 and $1,000, for a total amount of $4,000 per ATM, consistent with the defendant BIANCA VIEUX's prior instructions to the defendant CHRISTOPHER WALKER and the withdrawals made from the 2163 Account.

**C.    June 2024: Deposits of Falsified Cashier's Checks from Company #3**

25.    Between approximately February 29, 2024 and April 12, 2024, the defendant CHRISTOPHER WALKER, along with Aaron Warren and Tara Dildy, each opened a business-deposit account at Bank #2 at the same branch location in Nassau County, New York.

Falsified checks were then fraudulently presented for deposit into WALKER's and Dildy's business-deposit accounts and into a separate account in Warren's name at Bank #2.

26.    Specifically, on or about April 12, 2024, the defendant CHRISTOPHER WALKER opened a business-deposit account at Bank #2 with a number ending in 0044 (the "0044 Account").   WALKER provided the name of the business as "Christopher A.D. Walker" and described his business as a brokerage for selling car parts and used cars with an annual gross revenue of $50,000 and an annual net profit of $5,000.

27.    On the same day, at the same branch location, Tara Dildy also opened a business-deposit account at Bank #2, with a number ending in 0087 (the "0087 Account"). Dildy provided the name of the business as "Tara E Dildy" and claimed her business sold hairdressing and beautification services.   Like the defendant CHRISTOPHER WALKER, above, Dildy indicated that her business had an annual gross revenue of $50,000 and an annual net profit of $5,000.

28.    On approximately June 5, 2024, Aaron Warren purchased a cashier's check bearing serial number 9106686588 from Company #3 that was made payable to "Joe Paul" in the amount of $50.00.   The true name of the payee and amount of this check were subsequently falsified to be the defendant CHRISTOPHER WALKER and $96,142.27, respectively.

29.    Between approximately June 24, 2024 and June 28, 2024 the defendant CHRISTOPHER WALKER, along with Aaron Warren and Tara Dildy, each presented a falsified cashier's check purportedly issued by Company #3 for deposit into their accounts at Bank #2.   Specifically:

(a)     on approximately June 24, 2024, what appeared to be a cashier's check issued by Company #3 bearing serial number 9106686588 (the check for $50.00 made payable to "Joe Paul" described in paragraph 28, above), now made payable to the defendant CHRISTOPHER WALKER in the amount of $96,142.27, was presented for deposit into the 0044 Account;

(b)     on approximately June 25, 2024, what appeared to be a cashier's check issued by Company #3 bearing serial number 9106686728, made payable to Tara Dildy in the amount of $96,147.22, was presented for deposit into the 0087 Account;

(c)     on approximately June 28, 2024, what appeared to be a cashier's check issued by Company #3 bearing serial number 9106686889, made payable to Aaron Warren, was presented for deposit into an account at Bank #2 in Warren's name with a number ending in 5915 (the "5915 Account"). While the numerical amount on this check was $28,047.00, the word-written-out amount was "ninety six thousand one hundred forty seven and 22 cents"—the same amount as the falsified check deposited into Tara Dildy's business-deposit account, as described immediately above.

Each of these deposits was rejected.

30.     In addition, a similarly falsified cashier's check purporting to be issued by Company #3 was presented for deposit into an account at Bank #1 with a number ending in 2407 (the "2407 Account"), which belonged to the defendant DAIJA-NEK JOHNSON. Specifically, on approximately July 1, 2024, what appeared to be a cashier's check issued by Company #3 bearing serial number 9106686836, made payable to JOHNSON, was presented for deposit into the 2407 Account. While the numerical amount on this check was $57,122.00, the word-written-out amount was "ninety six thousand one hundred forty seven and 22 cents"—the same

amount listed on the falsified checks deposited into Tara Dildy's and Aaron Warren's respective accounts, as described immediately above.   This deposit, too, was rejected.

D.    April 2024 to October 2024: Deposits of Falsified Checks from Company #4

31.    Between April 2024 and October 2024, the defendants DAIJA-NEK JOHNSON and CHRISTOPHER WALKER, together with Aaron Warren, attempted to deposit at least six different falsified checks purporting to be made out by Company #4.

32.    On approximately April 11, 2024, a check bearing check number 767061 in the amount of $75,000.00 was made out by Company #4 to a payee located in Brooklyn, New York.   The true name and address of the payee on this check were subsequently falsified to be the name and address of the defendant DAIJA-NEK JOHNSON.   On approximately April 23, 2024, this falsified check was deposited into an account at Bank #1 with a number ending in 8558, which belonged to JOHNSON (the "8558 Account").   Following this deposit, between approximately May 2, 2024 and May 14, 2024, JOHNSON and others withdrew over $43,000 in cash from the 8558 Account, including several ATM withdrawals in amounts of $3,000 and $1,000 per ATM.

33.    This same check number, amount, and payor appeared on another falsified check that was made payable to the defendant CHRISTOPHER WALKER.   On approximately July 17, 2024, a falsified check with the same information as the April 11, 2024 check was deposited into an account at Credit Union #1 with a number ending in 9327, which belonged to WALKER (the "9327 Account").   Following this deposit, on approximately July 26, 2024, (a) $30,500 was wired from this account to an account at Credit Union #2 with a number ending in 1341, which also belonged to WALKER (the "1341 Account"), and (b) an additional $37,400

was wired from the account to an account at Bank #3 with a number ending in 1115, which belonged to Aaron Warren (the "1115 Account").

34.    Between approximately April 15, 2024 and April 26, 2024, at least three more checks were made out by Company #4 to payees in amounts of less than $1,000.   The true names of the payees were subsequently falsified to be the name of the defendant CHRISTOPHER WALKER or the name of Aaron Warren, and the amounts of each of these checks were changed to be $75,000.   Between approximately July 26, 2024 and August 6, 2024, these falsified checks were presented for deposit into accounts that belonged to WALKER and Warren at Investment Company #1, Credit Union #1, and Credit Union #2.   Each of these deposits was rejected.

E.    April to September 2024: Deposits of Falsified Checks from Company #5

35.    Between approximately April 11, 2024 and September 6, 2024, the defendants DESTINY MENDEZ, VALERIA WALDRON, CHRISTOPHER WALKER, and MICHELLE WILSON, together with Aaron Warren, attempted to deposit falsified checks purportedly made out by Company #5 into bank accounts that they controlled.

36.    Specifically, on approximately April 11, 2024, the defendant VALERIA WALDRON opened a business bank account with a number ending in 8678 (the "8678 Account") at a branch of Bank #1 in Glen Burnie, Maryland.   On approximately April 23, 2024, Aaron Warren messaged WALDRON, "I have something ready for you , I'm going to start the process with yours today[.]"

37.    On approximately May 1, 2024, what appeared to be a check bearing check number 706164, made out by Company #5 to the defendant VALERIA WALDRON in the amount of $91,101.23, was deposited into the 8678 Account.   On approximately May 20, 2024,

what appeared to be a check bearing check number 706259, made out by Company #5 to WALDRON in the amount of $13,943.20, was deposited into the 8678 Account. In fact, at that time Company #5 had not made out checks with check numbers 706164 or 706259.

38. Between approximately May 13, 2024 and May 21, 2024, the defendant VALERIA WALDRON and others withdrew over $90,000 in cash from the 8678 Account, including several ATM withdrawals in amounts of $3,000 and $1,000 per ATM.

39. On approximately May 2, 2024, what appeared to be a check bearing check number 706167, made out by Company #5 to the defendant MICHELLE WILSON in the amount of $78,855.42, was deposited into an account at Bank #1 with a number ending in 6339 (the "6339 Account"), which belonged to WILSON. In fact, at that time Company #5 had not made out a check with check number 706167.

40. Following this deposit, between approximately May 13, 2024 and May 14, 2024, the defendant MICHELLE WILSON and others withdrew over $77,000 from the 6339 Account, including several ATM withdrawals in amounts of $3,000 and $1,000 per ATM.

41. On approximately August 5, 2024, what appeared to be a check made out by Company #5 bearing check number 706724, payable to the defendant CHRISTOPHER WALKER in the amount of $86,788.22, was presented for deposit into an account at Investment Company #1 with a number ending in 0795, which belonged to WALKER. In fact, Company #5 never made out a check bearing check number 706724, and this deposit was rejected.

42. On approximately August 7, 2024, what appeared to be a check made out by Company #5 bearing check number 706707, payable to Aaron Warren in the amount of $86,788.22, was presented for deposit into an account at Investment Company #2 ending in 5898

(the "5898 Account"), which belonged to Warren.   In fact, Company #5 never made out a check bearing check number 706707, and this deposit was rejected.

43.    On approximately August 24, 2024, what appeared to be a check made out by Company #5 bearing check number 706707—the same false check number previously deposited by Aaron Warren—but now made payable to the defendant CHRISTOPHER WALKER in the same amount of $86,788.22, was presented for deposit into an account belonging to WALKER at Investment Company #3.   This deposit was rejected.

44.    On approximately August 26, 2024, what appeared to be a check made out by Company #5 bearing check number 706707—the same false check number previously presented for deposit into accounts belonging to the defendant CHRISTOPHER WALKER and Aaron Warren as referenced in paragraphs 42 and 43, above—but now made payable to WALKER in the amount of $78,855.42, was deposited into an account at Investment Company #1 with a number ending in 4002 (the "4002 Account"), which belonged to WALKER.   Unlike the two previous attempts, this deposit was accepted and money was credited to WALKER's account.   Thereafter, between approximately September 4, 2024 and September 5, 2024, WALKER transferred $78,900 from the 4002 Account to a separate account that belonged to him, thereby emptying the 4002 Account.

45.    On approximately August 14, 2024, what appeared to be a check made out by Company #5 bearing check number 706729, payable to Aaron Warren in the amount of $78,855.42—the same amount as the false check successfully deposited by the defendant CHRISTOPHER WALKER as referenced in paragraph 44, above—was presented for deposit into the 5898 Account.   In fact, Company #5 never made out a check bearing check number 706729, and this deposit was rejected.

46.    Between approximately September 4, 2024 and September 6, 2024, the defendant DESTINY MENDEZ communicated with Aaron Warren by telephone at least six times.   On approximately September 6, 2024, what appeared to be a check made out by Company #5 bearing check number 706926, payable to MENDEZ, also in the amount of $78,855.42, was presented for deposit into an account at Bank #1 with a number ending in 5696, which belonged to MENDEZ.   In fact, Company #5 never made out a check bearing check number 706926, and this deposit was rejected.

F.    October 2024: Deposit of Falsified Check from the City of New York

47.    On or about September 13, 2024, a check bearing check number 57345213 in the amount of $660.68 was made out by the City of New York to a payee who was an employee of the City of New York.   This check bore a reference number corresponding to the payee's employee-identification number, which is a unique number assigned to each employee of the City of New York.   The name of the payee on the check was subsequently falsified to be the name of the defendant DESTINY MENDEZ, the amount was changed to be $18,490.02, and the reference number was rewritten to be the employee-identification number of Aaron Warren. On approximately October 1, 2024 and October 2, 2024, the defendant DESTINY MENDEZ communicated with Warren by telephone at least four times.   On approximately October 2, 2024, this falsified check was presented for deposit into an account at Investment Company #3 with a number ending in 1788, which belonged to MENDEZ.   This deposit was rejected.

G.    January 2025: Deposit of Falsified Check from Individual #1

48.    On approximately January 22, 2025, what appeared to be a check bearing check number 418, made out by Individual #1 to the defendant BIANCA VIEUX in the amount of $75,000.00, was presented for deposit into an account at Bank #4 with a number ending in

8258, which belonged to VIEUX.   Individual #1 had previously made out a check with this check number but had made it payable to a different payee.   This deposit was rejected.

   H.  The Creation of Falsified Checks

   49.  As part of the Falsified-Checks Scheme, the defendant ███████ ████████ created falsified checks, including checks purporting to be issued by Company #4 and Company #5, for the defendant CHRISTOPHER WALKER in exchange for a fee.

   50.  For example, on approximately April 22, 2025, the defendant CHRISTOPHER WALKER texted the defendant ███████████ photographs of approximately six different checks, including a check purporting to be made out by Company #4 to WALKER, a check purporting to be made out by Company #5 to the defendant MICHELLE WILSON, and three checks purporting to be made out by Company #1.   WALKER then messaged ████████ "2 of the shank joints[,]" "So 4 of them in all[,]" "All with the name Christopher Walker[.]"  ████████ responded, "Bet send it I'll have em done n I'll uber it to you[.]"   WALKER then sent $200 to ████████ via Zelle, a mobile payment application. WALKER later sent ████████ additional details for his order: "You doing two us bank joints[,]" "For the 119k[,]" "119,012.50 cents[,]" "Then the one joint for the 75k[,]" "And the other joint for the 78,855.42[.]"

   51.  On approximately April 24, 2025, the defendant ████████████ messaged the defendant CHRISTOPHER WALKER, "This how you want it right ?" accompanied by a picture of a computer screen showing a digital image of a check in the Adobe Photoshop editing application.   The check depicted on the screen purported to be issued by Company #5 to WALKER in the amount of $78,855.42.   WALKER responded, "Yes[.]   That's it[.]"

### III.   The Production of Counterfeit Social Security Cards

52.   From approximately October 2024 to December 2024, the defendant STEVEN BOYCE created counterfeit United States Social Security cards for the defendant CHRISTOPHER WALKER in exchange for a fee.

53.   Specifically, on approximately October 12, 2024, the defendant CHRISTOPHER WALKER messaged the defendant STEVEN BOYCE that he needed help with "the ss", and BOYCE answered with a price list: "Bet physical with uv is 140[,] Physical without uv is 100[,] Pic of front & back signed is 70[.]"   BOYCE then sent WALKER a series of pictures and videos showing Social Security cards bearing the names of other individuals, including one video depicting a Social Security card in the name of "Heavy Pockets," on which a watermark bearing the logo of the Social Security Administration was illuminated with an ultraviolet light.

54.   The same day, October 12, 2024, the defendant CHRISTOPHER WALKER asked the defendant STEVEN BOYCE for a Social Security card with a particular name ("Alias-1") and a Social Security number that WALKER said he was inventing. Approximately 20 minutes later, BOYCE sent WALKER pictures of the front and back of a counterfeit Social Security card with the name Alias-1 and the Social Security number that WALKER had created.   WALKER told BOYCE that he would use Uber's package delivery service to pick the card up.   Approximately 50 minutes later, BOYCE confirmed, "Its in it[,]" "Otw to you[.]"   Later that day, WALKER messaged BOYCE, "Got it bro good looks[.]"

55.   On approximately October 30, 2024, the defendant CHRISTOPHER WALKER messaged the defendant STEVEN BOYCE asking for "3[.]" BOYCE answered, "All with uv ?" and told WALKER it would cost $420.   The same day, WALKER sent $420 via

Apple Pay to an account controlled by BOYCE. WALKER then sent BOYCE his own name and two other names ("Alias-2" and "Alias-3"). Shortly thereafter, BOYCE sent WALKER pictures showing the front and back of three counterfeit Social Security cards bearing those three names. In approximately September 2025, pursuant to a judicially-authorized search warrant, law enforcement officers conducted a search of WALKER's residence and located these three counterfeit Social Security cards in an envelope behind the bed in WALKER's bedroom.

56. The defendants CHRISTOPHER WALKER and STEVEN BOYCE explicitly discussed the fraudulent nature of their counterfeit Social Security cards. On approximately December 4, 2024, WALKER offered to pick up a Social Security card that he had previously ordered in the name of another individual, and BOYCE told WALKER that he had shredded it. BOYCE continued, "You can[']t be expecting me to hold on to fraudulent federal documents gang lol[.]" WALKER responded, "lol nah you right you right that's my fault I was mad busy schedules wasn't linking up[.]"

## COUNT ONE
(Conspiracy to Commit Wire Fraud and Bank Fraud)

57. The allegations contained in paragraphs one through 56 are realleged and incorporated as if fully set forth in this paragraph.

58. In or about and between July 2023 and June 2025, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants BIANCA VIEUX, DAIJA-NEK JOHNSON, DESTINY MENDEZ, ████████ ████████ VALERIA WALDRON, CHRISTOPHER WALKER, and MICHELLE WILSON, together with others, did knowingly and intentionally conspire to:

(a) devise a scheme and artifice to defraud victims including Bank #1, Bank #2, Bank #3, Bank #4, Investment Company #1, Investment Company #2, Investment

Company #3, Credit Union #1, and Credit Union #2, and to obtain money and property from them by means of one or more materially false and fraudulent pretenses, representations and promises, and for the purpose of executing such scheme and artifice, to transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce writings, signs, signals, pictures and sounds, contrary to Title 18, United States Code, Section 1343; and

(b)    execute a scheme and artifice to defraud Bank #1, Bank #2, Bank #3 and Bank #4, financial institutions the deposits of which were insured by the Federal Deposit Insurance Corporation; and Credit Union #1 and Credit Union #2, financial institutions the accounts of which were insured by the National Credit Union Share Insurance Fund, and to obtain moneys, funds, credits and other property owned by and under the custody and control of Bank #1, Bank #2, Bank #3, Bank #4, Credit Union #1, and Credit Union #2 by means of materially false and fraudulent pretenses, representations and promises, contrary to Title 18, United States Code, Section 1344.

(Title 18, United States Code, Sections 1349 and 3551 et seq.)

### COUNTS TWO THROUGH NINE
(Bank Fraud)

61.    The allegations contained in paragraphs one through 56 are realleged and incorporated as if fully set forth in this paragraph.

62.    On or about and between the dates set forth below, such dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants set forth below, together with others, did knowingly and intentionally execute and attempt to execute a scheme and artifice to defraud the financial institutions set forth below, the deposits of which were insured by the Federal Deposit Insurance Corporation and the National Credit Union Share Insurance Fund, and to obtain moneys, funds, credits and other property

18

owned by and under the custody and control of said financial institutions by means of materially false and fraudulent pretenses, representations and promises.

| Count | Approximate Dates | Financial Institution | Defendant(s) | Amount |
|---|---|---|---|---|
| TWO | July 5, 2023 through August 7, 2023 | Bank #1 | CHRISTOPHER WALKER | $119,012.50 |
| THREE | February 29, 2024 through June 28, 2024 | Bank #2 | CHRISTOPHER WALKER | $96,142.27 |
| FOUR | April 23, 2024 through July 1, 2024 | Bank #1 | DAIJA-NEK JOHNSON | $146,122.00 |
| FIVE | May 1, 2024 through May 21, 2024 | Bank #1 | VALERIA WALDRON | $105,044.43 |
| SIX | May 2, 2024 through May 14, 2024 | Bank #1 | MICHELLE WILSON | $78,855.42 |
| SEVEN | July 17, 2024 through August 1, 2024 | Credit Union #1 | CHRISTOPHER WALKER | $75,000.00 |
| EIGHT | September 6, 2024 | Bank #1 | DESTINY MENDEZ | $78,855.42 |
| NINE | January 22, 2025 | Bank #4 | BIANCA VIEUX | $75,000.00 |

(Title 18, United States Code, Sections 1344, 2 and 3551 et seq.)

## COUNTS TEN THROUGH FOURTEEN
(Money Laundering)

63.     The allegations contained in paragraphs one through 56 are realleged and incorporated as if fully set forth in this paragraph.

64.     On or about the following dates, within the Eastern District of New York and elsewhere, the defendants VALERIA WALDRON, CHRISTOPHER WALKER, and MICHELLE WILSON, together with others, did knowingly and intentionally engage in the monetary transactions set forth below, in and effecting interstate commerce, in criminally derived property that was of a value greater than $10,000 and was derived from specified unlawful activity, to wit: wire fraud and bank fraud, contrary to Title 18, United States Code,

Sections 1343 and 1344, respectively, knowing that the property involved in such monetary transactions represented the proceeds of some form of unlawful activity:

| Count | Approximate Date | Defendant(s) | Monetary Transaction |
|---|---|---|---|
| TEN | May 13, 2024 | MICHELLE WILSON | Withdrawal of $20,000 of fraudulently obtained funds from the 6339 Account |
| ELEVEN | May 16, 2024 | VALERIA WALDRON | Withdrawal of $20,000 of fraudulently obtained funds from the 8678 Account |
| TWELVE | July 26, 2024 | CHRISTOPHER WALKER | Transfer of $30,500 of fraudulently obtained funds from the 9327 Account to the 1341 Account |
| THIRTEEN | July 26, 2024 | CHRISTOPHER WALKER | Transfer of $37,400 of fraudulently obtained funds from the 9327 Account to the 1115 Account |
| FOURTEEN | September 4, 2024 | CHRISTOPHER WALKER | Transfer of $78,000 of fraudulently obtained funds from the 4002 Account to the 1341 Account |

(Title 18, United States Code, Sections 1957, 2 and 3551 et seq.)

COUNT FIFTEEN
(Conspiracy to Commit Identification Documents Fraud)

65.    The allegations contained in paragraphs one through 56 are realleged and incorporated as if fully set forth in this paragraph.

66.    In or about and between October 2024 and September 2025, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants STEVEN BOYCE and CHRISTOPHER WALKER, together with others, did knowingly and intentionally conspire to produce without lawful authority one or more identification documents, authentication features and false identifications, to wit: counterfeit

United States Social Security cards, that appeared to be issued by and under the authority of the United States, contrary to Title 18, United States Code, Section 1028(a)(1).

(Title 18, United States Code, Sections 1028(f) and 3551 et seq.)

### CRIMINAL FORFEITURE ALLEGATION AS TO COUNTS ONE THROUGH NINE

67.    The United States hereby gives notice to the defendants charged in Counts One Through Nine that, upon their conviction of such offenses, the government will seek forfeiture in accordance with Title 18, United States Code, Section 982(a)(2)(A), which requires any person convicted of such offenses to forfeit any property constituting, or derived from, proceeds obtained directly or indirectly as a result of such offenses.

68.    If any of the above-described forfeitable property, as a result of any act or omission of the defendants:

    (a)    cannot be located upon the exercise of due diligence;

    (b)    has been transferred or sold to, or deposited with, a third party;

    (c)    has been placed beyond the jurisdiction of the court;

    (d)    has been substantially diminished in value; or

    (e)    has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Sections 982(b)(1), to seek forfeiture of any other property of the defendants up to the value of the forfeitable property described in this forfeiture allegation.

(Title 18, United States Code, Sections 982(a)(2)(A) and 982(b)(1); Title 21, United States Code, Section 853(p))

## CRIMINAL FORFEITURE ALLEGATION
## AS TO COUNTS TEN THROUGH FOURTEEN

69.    The United States hereby gives notice to the defendants charged in Counts Ten through Fourteen that, upon their conviction of such offenses, the government will seek forfeiture in accordance with Title 18, United States Code, Section 982(a)(1), which requires any person convicted of such offenses to forfeit any property, real or personal, involved in such offenses, or any property traceable to such property.

70.    If any of the above-described forfeitable property, as a result of any act or omission of the defendants:

　　(a)    cannot be located upon the exercise of due diligence;

　　(b)    has been transferred or sold to, or deposited with, a third party;

　　(c)    has been placed beyond the jurisdiction of the court;

　　(d)    has been substantially diminished in value; or

　　(e)    has been commingled with other property which cannot be divided

without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b)(1), to seek forfeiture of any other

22

property of the defendants up to the value of the forfeitable property described in this forfeiture allegation.

(Title 18, United States Code, Sections 982(a)(1) and 982(b)(1); Title 21, United States Code, Section 853(p))

A TRUE BILL

███████████████████████████████

FOREPERSON

*By David Pitluck, Assistant U.S. Attorney*
JOSEPH NOCELLA, JR.
UNITED STATES ATTORNEY
EASTERN DISTRICT OF NEW YORK